UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BASILISA SKAPELY,                    :
                                     :CIVIL ACTION NO. 3:15-CV-1065
            Plaintiff,               :
                                     :(JUDGE CONABOY)
            v.                       :
                                     :
CAROLYN W. COLVIN,                   :
Acting Commissioner of               :
Social Security,                     :
                                     :
            Defendant.               :

_____

**MEMORANDUM**

    Here we consider Plaintiff's appeal from the Commissioner's
denial of Disability Insurance Benefits ("DIB") under Title II of
the Social Security Act.  (Doc. 1.)  Plaintiff protectively filed
an application for benefits on March 12, 2012, alleging disability
beginning on January 1, 2011.  (R. 16.)  An April 5, 2012,
Disability Report indicates that Plaintiff claimed her ability to
work was limited by unknown lower abdominal pain and severe
migraines.  (R. 265.)

    Plaintiff's claim was initially denied on September 10, 2012.
(R. 16.)  On September 30, 2012, she requested a hearing before an
Administrative Law Judge ("ALJ").  (R. 181-82.)  A hearing was held
on January 17, 2014, before ALJ Sharon Zanotto.  (R. 29-57.)
Plaintiff appeared in at the hearing along with her attorney, Nolan
Meeks.  (*Id.*)  Andrew Caparelli, a Vocational Expert ("VE"), also
testified.  (*Id.*)  A Spanish interpreter was sworn in to act as an

interpreter for the hearing.  (R. 31.)

In her January 31, 2014, Decision, ALJ Zanotto concluded Plaintiff had the severe impairment of migraine headaches.  (R. 18.)  She determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the listings.  (R. 19.)  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with certain nonexertional limitations and that she was capable of performing her past relevant work as a Cleaner-Housekeeper and Newspaper Delivery Driver as well as other work that existed in significant numbers in the national economy.  (R. 21-22.)  The ALJ therefore found Plaintiff had not been disabled under the Act since the alleged onset date of January 1, 2011, through the date last insured of September 30, 2012.  (R. 23.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ erred in finding Plaintiff's multiple impairments to be non-severe; 2) substantial evidence does not support the ALJ's evaluation of a consultative examiner's opinion; 3) the ALJ's findings that Plaintiff can perform light work and return to her past relevant work are not supported by substantial evidence; and 4) substantial evidence does not support the ALJ's credibility evaluation.  (Doc. 12 at 1-2.)  After careful consideration of the administrative record and the parties' filings, I conclude

2

Plaintiff's appeal is properly denied.

## I. Background

**A.   *Procedural Background***

Plaintiff filed this action on May 29, 2015.  (Doc. 1.)   She appeals the denial of benefits made final by the March 31, 2015, Appeals Council denial of her request for review of the ALJ's decision (R. 1).

Defendant filed her answer and the Social Security Administration transcript on July 30, 2015.  (Docs. 9-10.) Plaintiff filed her supporting brief on September 13, 2015. (Doc. 12.)  Defendant filed her opposition brief on October 16, 2015. (Doc. 14.)  Plaintiff filed her reply brief on October 23, 2015. (Doc. 15.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on January 9, 1957.  (R. 22.)  She was fifty-five years old on the date last insured, September 30, 2012. (*Id.*)  Plaintiff has a limited education.  (*Id.*)

**1.   Impairment Evidence**

The ALJ determined that Plaintiff had the severe physical impairment of migraine headaches.  (R. 18.)  She concluded that Plaintiff's abdominal pain and hypothyroidism were non-severe.  (R. 18-19.)  ALJ Zanotto also notes that several impairments alleged by Plaintiff occurred after her date last insured of September 30,

2012, including recurrent right carpal tunnel syndrome.  (R. 19.)

*a.   Abdominal Pain*

In March 2010, testing revealed that Plaintiff had a hiatal hernia and the examining physician recommended anti-reflux medication.  (R. 317-18.)  In October 2010, Plaintiff was diagnosed with urinary frequency and pain.  (R. 403-04.)

In July 2011, Plaintiff went to the emergency department at Memorial Hospital with complaints of abdominal pain, nausea, diarrhea, and urinary frequency and urgency.  (R. 376-77.)  The examining physician diagnosed abdominal pain and suspected IBS. (R. 381.)

On October 19, 2011, John Monk, M.D., of Apple Hill Surgical Associates saw Plaintiff for a second opinion about her hiatal hernia.  (R. 323.)  Plaintiff reported that the hernia was painful, intermittently worse at times.  (*Id.*)  She stated she wanted "to make sure she 'has a hernia'" which was scheduled to be repaired by Dr. James Bonheur on October 28, 2011. (*Id.*)  Dr. Monk did not feel a definite hernia but Plaintiff had "induration beneath her low transverse scar."  (R. 324.)  He recommended a CT scan to rule out a definite hernia.  (*Id.*)

Plaintiff again saw Dr. Monk on October 24, 2011, for follow-up consultation on her superpubic pain.  (R. 321.)  He noted that the CT of the abdomen and pelvis was normal and suggested a gynecology consultation.  (*Id.*)

4

On December 2, 2011, Plaintiff saw Robert Bonslaver, M.D., of Yorktowne Urology, PC.  (R. 332-34.)  She was referred to him by Robert Pizziketti, M.D., due to microscopic hematuria.  (R. 332.) Dr. Bonslaver found some red blood cells on microscopic urine and also some bacteria.  (R. 334.)  He provided a three-day course of Ciprofloxican for a possible urinary tract infection and planned to see Plaintiff again in two to three weeks and do further testing if red blood cells persisted.  (*Id.*)

At her December 23, 2011, visit with Dr. Bonslaver, Plaintiff reported persistent intermittent lower abdominal pain since her last visit.  (R. 335.)  She said she had plans to see a GI specialist.  (*Id.*)  The urine culture from Plaintiff's previous visit was negative.  (*Id.*)  Because Plaintiff's urine was dipstick positive for blood with a few red blood cells seen under microscopy, Dr. Bonslaver noted he would proceed with cystology to complete her workup.  (*Id.*)  He also recommended that Plaintiff follow up with a GI specialist for her chronic intermittent lower abdominal pain.  (R. 336.)

At her January 9, 2012, visit, Dr. Bonslaver noted that Plaintiff would be scheduled for office cystoscopy and referred to a gastroenterologist for evaluation of irritable bowel.  (R. 338.) The cystoscopy performed on January 17, 2012, was normal.  (R. 339.)  Dr. Bonslaver strongly recommended that Plaintiff seek GI evaluation for her chronic abdominal pain.  (R. 339.)

5

On July 9, 2012, Plaintiff saw Robert G. Shultz, M.D., for a consultative examination.  (R. 364-71.)  In the General Medical Evaluation, it was noted that Plaintiff complained of lower abdominal pain which had been present for at least a year and a half, she had a gastroenterologist consult with nothing found after colonoscopy and endoscopy, and a CAT scan of the abdomen showed nothing.  (R. 364.)  She rated the pain at ten, said it lasts one or two hours then goes away, and sometimes she gets in a tub of hot water for relief.  (*Id.*)  Plaintiff also reported that her family doctor said she would have to live with this pain as no source had been found for it.  (*Id.*)  Plaintiff identified migraine headaches as an additional problem.  (R. 365.)  She stated she had them since 1998, she gets them once or twice a week and they last a couple of hours, Advil gives some relief, and she sometimes went to the emergency room where she was given morphine.  (*Id.*)  Dr. Shultz's "Impression" was "lower abdominal pain, etiology undetermined and one has to consider that she has something regarding her bladder especially with lower abdominal pain and the six or eight times at night nocturia, but we don't know where that stance [sic] and also she has a history of migraine headaches."  (R. 366-67.)

On September 20, 2012, Plaintiff saw Marsha D. Bornt, M.D., for pelvic pain.  (R. 417.)  Plaintiff also complained of bloating, weight gain, painful rectal pressure, and diarrhea, nausea and sweating with her pain.  (*Id.*)  Upon examination, Plaintiff

appeared healthy and well developed, with no signs of acute distress present.  (*Id.*)  Her abdomen was soft, nontender, nondistended, no masses, normoactive bowel sounds, no hernias, and no palpable hepatosplenomegaly.  (*Id.*)  The remainder of her physical examination was also normal.  (*Id.*)  Dr. Bornt assessed Plaintiff to have pelvic pain.  (R. 418.)

On October 17, 2012, Plaintiff was seen by Thomas Nicholson, M.D., at Leader Surgical Associates for abdominal pain.  (R. 396.) The plan was to try Amitzia and follow up in two weeks.  (*Id.*)

b.   *Migraine Headaches*

Office treatment notes from Family Health Associates indicate that Plaintiff presented with the chief complaint of headache on March 30, 2012.  (R. 345.)  Plaintiff reported that they occurred two to three times per week and ibuprofen was used with effect. (R. 346.)

As noted above, at the consultative examination in July 2012, Plaintiff identified migraine headaches as a problem along with her complaint of lower abdominal pain.  (R. 365.)  She stated she had them since 1998, she gets them once or twice a week and they last a couple of hours, Advil gives some relief, and she sometimes went to the emergency room where she was given morphine.  (*Id.*)

On October 13, 2012, Plaintiff was seen at MedExpress York with the chief complaint of headache for which she had taken Advil without relief.  (R. 449.)  Plaintiff was given Hydromorphone and

7

Phenergan injections.  (R. 450.)

On September 14, 2013, Plaintiff was seen at MedExpress York for headache.  (R. 452.)  Plaintiff was given injections of Toradol and Phenergan.  (R. 453.)

c.   *Carpal Tunnel Syndrome*

On September 27, 2013, Plaintiff was seen by Stewart Gross, M.D., of Hand Surgery of Southern Connecticut.  (R. 455.)  Dr. Gross noted that Plaintiff presented

> with a one year history of aching pains radiating to her right elbow from the wrist and associated with intermittent numbness and paresthesias to the thumb, middle and ring digits.  She has 6 times per week nighttime components but denies any morning components consistent with carpal tunnel syndrome and tendinitis respectively.  Hair care and telephone usage increases these symptoms. She has weakness and dropping hand-held objects.  She recently underwent radiographic evaluation of her right hand, elbow and forearm which were all unremarkable. Serological testing revealed no iron deficiency anemia.  The left hand and arm are asymptomatic.
>
> She is status post right carpal tunnel release procedure in 2003 that was preceded by EMG nerve conduction studies that were consistent with right median nerve compression at the carpal canal.

(R. 455.)  Examination of the hand and elbow were abnormal: on the right hand Phalen's test was positive at less than five seconds and a forearm compression test was positive at ten seconds; moderate tenderness was noted at the lateral epicondylar area of the right elbow, and a non-resisted wrist extension test was positive.  (R.

8

456.)  Dr. Stewart assessed Carpal Tunnel Syndrome Right recurrent. (*Id.*)  Dr. Gross recommended repeat EMG nerve conduction studies and conservative treatment.  (R. 457.)

The results of electrodiagnostic studies which Plaintiff had on October 18, 2013, were abnormal.  (R. 459.)  She saw Dr. Gross again on December 13, 2013.  (R. 512.)  He explained that the repeat EMG nerve conduction studies would be positive since she had already undergone a carpal tunnel release.  (R. 513.)  Based on Plaintiff's clinical symptoms, Dr. Gross opined that she was most probably indicated for a right median neurolysis procedure.  (*Id.*) Plaintiff wanted to consider the recommendation and indicated she would contact Dr. Gross with her decision.  (*Id.*)

2. **Opinion Evidence**

John Monk, M.D., completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities on April 13, 2012.  (R. 319-20.)  Noting that he had last seen Plaintiff on October 24, 2011, Dr. Monk opined that Plaintiff had no limitations.  (*Id.*)

Robert G. Shultz, M.D., completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities on July 9, 2012, having seen Plaintiff the same day for a consultative examination.  (R. 368-69.)  He indicated that Plaintiff could carry and lift up to ten pounds frequently and could not carry or lift more weight due to carpal tunnel surgery on

9

her right hand several years before.  (R. 369.)  Dr. Shultz noted that Plaintiff could walk for one-half hour due to fatigue, and pushing and pulling were limited in her upper and lower extremities due to lower back complaints.  (*Id.*)  He did not identify any specific limitations regarding postural activities but commented "due low back pain."  (R. 368.)

The State agency medical consultant, V. Rama Kumar, M.D., completed a residual functional capacity evaluation on July 26, 2012.  (R. 171-72.)  Dr. Kumar indicated that Plaintiff had exertional limitations: she could occasionally lift, and/or carry fifty pounds; she could frequently lift and/or carry twenty-five pounds; and she could stand and/or walk and sit for about six hours in an eight-hour day.

**3.    Function Report and Hearing Testimony**

Plaintiff reported that her pain limited her ability to work because it prevented her from moving around as she would like, and the severity and uncertainty as to when she would have pain also did not allow her to work.  (R. 272.)  She noted that the pain also interfered with her sleep.  (R. 273.)  Plaintiff stated she was able to take care of her personal needs.  (R. 274.)  She also stated she was able to cook, iron, clean, and do laundry depending on how she was feeling that day.  (*Id.*)  Plaintiff indicated she could go out alone and drive a car, and she went shopping two or three times per week, usually short trips of less than an hour.

(R. 275.)  Plaintiff said she was limited in her abilities to lift, squat, bend, sit, kneel, talk, climb stairs, and concentrate because of her pain.  (R. 277.)  Plaintiff reported that she was able to walk for thirty minutes and would then need to rest for ten minutes.  (*Id.*)

At the ALJ hearing, Plaintiff's attorney identified abdominal pain, migraine headaches, carpal tunnel syndrome, left knee degenerative changes, and joint pain as the conditions that limited Plaintiff's ability to work prior to her date last insured of September 30, 2012.  (R. 33.)

Plaintiff testified that she last worked as a newspaper delivery driver in Connecticut in 2007 and stopped working because of her headaches.  (R. 38-39.)  She said she used to take Advil for the headache pain but changed to Excedrin Migraine and after laying down for two hours the headache would be gone.  (R. 41-42.)

Plaintiff stated that the abdominal pain began in 2010 and she experienced severe pain four times per week.  (R. 46-47.)  She also stated that the Oxycodone or Hydrocodone her doctor prescribed for the pain alleviates the pain and she then goes to sleep.  (R. 47-48.)

Regarding carpal tunnel syndrome, Plaintiff testified only that her family doctor prescribed medicine for the pain and referred her to see Dr. Gross again when it was getting worse.  (R. 49-50.)

ALJ Zanotto asked VE Andrew Caparelli whether Plaintiff could perform her past relevant work as a newspaper delivery driver and cleaner, housekeeping if she were limited to occasional crouching, kneeling, stooping, climbing ramps and stairs, and needed to avoid very loud noises. (R. 53-54.)  The VE responded that Plaintiff would be able to do these jobs as customarily performed and actually performed. (R. 54.)  He clarified that the newspaper delivery driver is a medium exertional level position and the cleaner, housekeeping is a light exertional level position. (R. 53-54.)  VE Caparelli also identified other work that a person with the limitations identified by the ALJ could do: a laundry worker II at the medium exertional level and assembler, electrical accessories at the light exertional level. (R. 54.)

**4.   ALJ Decision**

By decision of January 31, 2014, ALJ Zanotto determined that Plaintiff was not disabled as defined in the Social Security Act through September 30, 2012, the last date insured. (R. 23.)  She made the following findings of fact and conclusions of law:

> 1.   The claimant last met the insured status requirements of the Social Security Act on September 30, 2012.
>
> 2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2011 through her date last insured of September 30, 2012 (20 CFR 404.1571 et seq.).
>
> 3.   Through the date last insured, the

12

claimant had the following severe impairment: Migraine Headaches (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is capable of occasional crouching, kneeling, stooping, climbing ramps and stairs, but needs to avoid loud or very loud work environments due to potential migraine headaches.

6. Through the date last insured, the claimant was capable of performing past relevant work as a Cleaner-Housekeeper and Newspaper Delivery Driver, as they are customarily performed in the national economy and actually performed by the claimant.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2011, the alleged onset date, through September 30, 2012, the date last insured (20 CFR 404.1520(f)).

(R. 18-23.)

ALJ Zanotto identified Plaintiff's alleged limitations and

supported her assessment that the intensity, persistence and limiting effects of Plaintiff's symptoms were not entirely credible with a review of evidence of record.  (R. 19-21.)  She cited Plaintiff's abilities identified in the function report as well as medical opinions in support of the RFC.  (R. 18-19.)

Not only did ALJ Zanotto conclude that Plaintiff could perform her past relevant work, but she also made alternative findings for step five of the sequential evaluation process and concluded that Plaintiff could perform other jobs that existed in significant numbers in the national economy based on hypothetical questions posed to the VE and the VE's responses to these questions and other relevant inquiries.  (R. 21-22.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person

---

for him, or whether he would be hired if he
applied for work.

42 U.S.C. § 423(d)(2)(A).

with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fourth step of the process when the ALJ found that Plaintiff was capable of performing her past relevant work.  (R. 21.)  Also as explained above, the ALJ made alternative findings for step five of the sequential evaluation process concluding that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 21-22.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality

16

> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an

exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v.*

18

*Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases

demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

## B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff alleges the following: 1) the ALJ erred in finding Plaintiff's multiple impairments to be non-severe; 2) substantial evidence does not support the ALJ's evaluation of a consultative examiner's opinion; 3) the ALJ's findings that Plaintiff can perform light work and return to her past relevant work are not supported by substantial evidence; and 4) substantial evidence does not support the ALJ's credibility evaluation.  (Doc. 12 at 1-2.)

## 1.   Impairment Severity

Plaintiff first asserts the ALJ erred in that she found Plaintiff's lower abdominal pain to be non-severe and did not consider her carpal tunnel syndrome.  (Doc. 12 at 14.)  I disagree.

a.   *Lower Abdominal Pain*

In support of her assertion that the ALJ should have found her lower abdominal pain to be a severe impairment, Plaintiff provides numerous citations to the record where Plaintiff complained of lower abdominal pain.  (Doc. 12 at 14-17.)  She does not, however, point to any objective evidence of debilitating pain or the limiting effects of Plaintiff's pain on her ability to work

as is her burden at this stage of the analysis.  Our review of the record finds no objective verification of the limiting effects of Plaintiff's lower abdominal pain which the ALJ overlooked.  To the contrary, limitations identified regarding Plaintiff's ability to perform work-related physical activity were based on earlier carpal tunnel surgery (2003) or complaints of low back pain.  (*See* R. 368-69.)  Although the low back pain may have been related to abdominal pain, the limited reduction in the range of motion of the lumbar spine identified on the Range of Motion Chart (R. 370) does not support a severity finding.  Therefore, I cannot conclude that the ALJ erred on this claimed basis.

b.    *Carpal Tunnel Syndrome*

Plaintiff next asserts that the ALJ failed to comply with SSR 83-20 in considering Plaintiff's carpal tunnel syndrome and concluding that this impairment occurred after her date last insured of September 30, 2012.  (Doc. 12 at 17-20.)  While Plaintiff is correct that SSR 83-20 addresses evidence of the onset of a disabling impairment, the ruling does not support her assertion that the ALJ erred in this case.

SSR 83-20 states that for disabilities of non-traumatic origin, "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity."  SSR 83-20, 1983 WL 31249, at *3 (S.S.A.).  When precise evidence is not available and

there is a need for inferences to be made, the ruling provides further guidance.

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. The judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

*Id.* at *3.

Here there is no objective evidence that Plaintiff's recurrent carpal tunnel syndrome was a debilitating impairment prior to her date last insured. Plaintiff's assertion to Dr. Gross that she had experienced pain and other symptoms for the year preceding her September 27, 2013, office visit (R. 455) is subjective evidence which at most indicates that Plaintiff had *some* symptoms for a few days prior to her date last insured of September 30, 2012. This is not evidence that the symptoms were severe or limited Plaintiff's ability to engage in any substantial gainful activity for the durational period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Importantly, diagnoses alone are insufficient to establish severity at step two--it is evidence of limitations that significantly limit a claimant's ability to do basic work activities that establishes severity. *See Salles v. Comm'r of Soc.*

22

*Sec.*, 229 F. App'x 140, 144 (3d Cir. 2007) (not precedential).  At this stage of the analysis it is Plaintiff's burden to show that the impairment was of sufficient severity for the required period of time, and she has not done so.  *Id.*  Therefore, this claimed error is without merit.

Furthermore, as argued by Defendant, this claimed error is not cause for remand because the ALJ found in favor of Plaintiff at step two and continued her analysis to step four.  (Doc. 14 at 11.) In deciding Plaintiff's RFC, the ALJ considered Plaintiff's alleged limitations which existed during the relevant time period and were supported by the evidence.  (*Id.*)

## 2. __Consultative Examiner's Opinion__

Plaintiff next argues the ALJ improperly evaluated Dr. Shultz's opinion because she did not apply the factors set out in 20 C.F.R. 404.1527(c) and provided no rationale for assigning moderate rather than great weight to the opinion.  (Doc. 12 at 21-22.)  Plaintiff further asserts that the failure to address the relevant factors and the improper evaluation of Dr. Shultz's opinion resulted in the ALJ disregarding medical opinion evidence "which most likely would have directed a finding that Skapely is unable to engage in substantial gainful activity."  (*Id.* at 22.)  I conclude this claimed error is not cause for reversal or remand.

Although Plaintiff asserts that ALJ Zanotto provided no rationale for assigning only moderate weight to Dr. Shultz's

23

opinion, I read her decision to limit the weight assigned because it conflicted with Dr. Monk's opinion and she concluded that the record contained only evidence indicative of occasional migraine headaches and abdominal pain, "neither of which has been adequately explained by diagnostic testing." (R. 21.)  The ALJ was entitled to attribute more weight to Dr. Monk's opinion than to Dr. Shultz's opinion because Dr. Monk was a treating physician and Dr. Shultz an examining physician. *See* 20 C.F.R. § 404.1527(c)(2).  To the extent the ALJ accurately portrays the record and Dr. Shultz's opinion identifies limitations greater than those supported by objective evidence and the opinion of a treating physician, substantial evidence supports limiting the weight afforded the opinion.  Contrary to Plaintiff's inference, a conclusion that an ALJ's determination is supported by substantial evidence does not require that the ALJ cite rulings and regulatory provisions applicable to the issue. *See*, *e.g.*, *Kent*, 710 F.2d at 114; *see also Holiday v. Barhart*, 76 F. App'x 479, 482 (3d Cir. 2003) (not precedential) (ALJ not required to specifically mention relevant SSRs, it is enough that the analysis by and large comports with relevant provisions).  Plaintiff cites no authority to support a contrary  proposition.

Plaintiff has the burden of identifying harmful error at this step of the analysis and Plaintiff provides no argument to support her conclusory assertion that articulation of the § 404.1527(c)

24

factors would most likely have directed a finding of disability. (*See* Doc. 12 at 22.)   Further, a review of the evidence cited by Plaintiff in this section of her brief shows that it primarily relates to Plaintiff's subjective reporting to Dr. Shultz.  (Doc. 12 at 21-22; R. 364-66.)   Regarding opinion evidence--the only evidence relevant to this claimed error--Plaintiff is correct that Dr. Shultz opined that Plaintiff can lift and carry up to ten pounds on a frequent basis due to a 2003 carpal tunnel surgery, and assessed that Plaintiff is limited in her upper and lower extremities.  (Doc. 12 at 22.)  Dr. Shultz noted that extremity limitations were due to low back pain complaints (R. 369), and physical examination did not note any findings regarding the low back (R. 366).  Though the Range of Motion Chart noted that flexion-extension of the lumbar region was limited to 80 degrees on a scale of 0-90 degrees due to lower abdominal pain, Plaintiff makes no showing that such a limitation "would have directed a finding that [she] is unable to engage in substantial gainful activity" (Doc. 12 at 22).  Similarly, Plaintiff does not show how weight limitations which were attributed only to surgery which occurred over eight years earlier (R. 369) and not to any difficulties identified on examination (*see* R. 366) would have directed a finding of disability.

3.    **Residual Functional Capacity and Step Four Determinations**

Plaintiff maintains that the ALJ's findings that

Plaintiff can perform light work and return to her past relevant work are not supported by substantial evidence.  (Doc. 12 at 23.) I conclude that this claimed error is not cause for reversal or remand.

This claimed error requires little discussion because Plaintiff does not acknowledge the ALJ's alternative step five analysis and conclusion.  (*See* R. 21-22.)  Therefore, even if the ALJ had erred at step four, she alternatively proceeded to step five and based her step five determination on appropriate VE testimony.

**4.   Credibility Evaluation**

Plaintiff claims the ALJ's credibility evaluation is not supported by substantial evidence.  (Doc. 12 at 25-27.)  I conclude this claimed error is not cause for reversal or remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873

(3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must

evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Here the ALJ specifically considered many of the identified factors including activities of daily living, the type of treatment received, precipitating and aggravating factors, and the type and effectiveness of medication.  (R. 21.)   ALJ Zanotto's analysis is factually accurate and legally adequate.  Plaintiff does not dispute the factual accuracy of the ALJ's analysis; Plaintiff's criticism of the legal adequacy is conclusory.

First, Plaintiff states that her activities of daily living do not show that she could perform a full-time position because she

is able to stop when needed and postpone activities due to her symptoms when she is at home.  (Doc. 12 at 26.)  Importantly, the ALJ did not rely only on Plaintiff's activities of daily living in finding that her allegations of disabling pain were not fully credible.  As noted above, ALJ Zanotto looked at many legally relevant factors in making her credibility determination.

Second, Plaintiff criticizes the ALJ's analysis of her credibility regarding her migraine headaches.  (Doc. 12 at 26.) Plaintiff quotes the ALJ as remarking "'her allegations of frequent and disabling migraines [sic] headaches are not supported by frequent physician visits or emergency department visits.'"  (Doc. 12 at 26 (quoting R. 21).)  Plaintiff characterizes the ALJ's statement as an argument that Plaintiff "only uses conservative treatment."  (*Id.*)  She concludes the rationale does not automatically indicate that Plaintiff lacks the disabling condition, and further concludes that "the ALJ absolutely does not provide any support for this assertion."  (Doc. 12 at 26-27.)

This criticism is flawed for several reasons.  A finding that a claimant received only conservative treatment is an appropriate consideration in assessing credibility regarding disabling pain. *See Garrett v. Commissioner of Social Security*, 274 F. App'x 159, 164 (3d Cir. 2008) (not precedential).  Moreover, Plaintiff fails to mention that, in addition to citing infrequent physician and ER visits, the ALJ also stated that Plaintiff "refused a lumbar

puncture procedure.  The claimant only uses over-the-counter medication (Excedrin) to manage her headaches.  The medication is usually effective within two hours."  (R. 21.)  The ALJ also noted that the headaches were "occasional" and had not been adequately explained by diagnostic testing.  (*Id.*)  Thus, a review of the ALJ's decision shows that, to the extent Plaintiff is correct that the ALJ undermined her credibility related to the disabling effects of her migraine headaches because she received only conservative treatment, this is only part of the story in that the ALJ cited multiple reasons for finding Plaintiff's allegations of disabling pain less than credible--lack of diagnostic testing, lack of treatment, effectiveness of over-the-counter medications, and activities of daily living.  I find no error in this assessment.

Plaintiff's assertion that the ALJ failed to properly apply the Medical Vocational Guidelines (Doc. 12 at 27) is also without merit.  It is based on the conclusion that Plaintiff is limited to sedentary or light work--a conclusion not reached by the ALJ.

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this action.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: November 20, 2015